1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION


_ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                              )
                              )
UNITED STATES OF AMERICA      )
                              )
v.                            )  Criminal No.
                              )  3:20CR55
KELLEN THOMAS DONELSON        )
                              )  September 28, 2020
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _)




COMPLETE TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE M. HANNAH LAUCK
UNITED STATES DISTRICT JUDGE






APPEARANCES:

Kevin Elliker, Assistant United States Attorney
Office of the U.S. Attorney
SunTrust Building
919 East Main Street, Suite 1900
Richmond, Virginia   23219

          Counsel for the United States

Carolyn V. Grady, Assistant Federal Public Defender
Office of the Federal Public Defender
701 E. Broad Street, Suite 3600
Richmond, Virginia   23219

          Counsel for the Defendant

          DIANE J. DAFFRON, RPR
          OFFICIAL COURT REPORTER
        UNITED STATES DISTRICT COURT

1          (The proceedings in this matter commenced at

2     11:12 a.m.)

3          THE CLERK:  Case No. 3:20CR55, *United States*

4     *of America versus Kellen Thomas Donelson*.

5          The United States is represented by Kevin

6     Elliker.  The defendant is represented by Carolyn

7     Grady.

8          Are counsel ready to proceed?

9          MR. ELLIKER:  The United States is ready,

10    Your Honor.

11         MS. GRADY:  The defense is ready, Your Honor.

12    Good morning.

13         THE COURT:  All right.

14         MR. ELLIKER:  Good morning, Your Honor.

15         THE COURT:  Good morning.

16         MR. ELLIKER:  We're here for the sentencing

17    of Mr. Donelson.  He's pleaded guilty to one violation

18    of 18, United States Code, Section 2251, Subsection

19    (a), production of child pornography.

20         THE COURT:  Mr. Elliker, I'm going to ask you

21    to pull the microphone a little closer to you.  I

22    don't know why I'm having trouble hearing you.  Maybe

23    it's because of the plexiglass.  I don't know.

24         MR. ELLIKER:  I'll try to do better.

25         THE COURT:  Okay.

1         MR. ELLIKER:  That offense carries a

2    mandatory minimum sentence of 15 years' imprisonment,

3    a statutory maximum of 30 years, a maximum fine of

4    $250,000, at least five years and up to life of

5    supervised release, restitution as ordered by the

6    Court, and a $100 special assessment.

7         The United States has reviewed the

8    presentence report and has no substantive corrections

9    or objections to it, although there are two, I think,

10   minor typos I've identified over the weekend.  I've

11   already conferred with Ms. Grady about these.

12        In paragraph 50 of the PSR, there is a pretty

13   straightforward typo of the defendant's birth year.

14   It says 1087.  It should be 1987.  And within the

15   relevant conduct in paragraph 20 of the presentence

16   report --

17        THE COURT:  I'm sorry.  Was that paragraph

18   15?

19        MR. ELLIKER:  Fifty.  I apologize.

20        THE COURT:  Fifty.  Okay.

21        MR. ELLIKER:  Fifty.

22        THE COURT:  Okay.  Right.  Got it.

23   Apologies.

24        MR. ELLIKER:  And then paragraph 20, the last

25   sentence in that paragraph says, Information from the

4

1   defendant's chat logs show he mentioned the website

2   motherless.com in chats with other users in November

3   and December 2018.  That should be 2013.  So that when

4   you look at that sentence it shows conduct bridging

5   from November of 2013 through April of 2014.

6        THE COURT:  All right.

7        MR. ELLIKER:  And then related to that, Your

8   Honor, I had a slip of the finger in my own sentencing

9   position.  It is correct in the PSR, but on page 6 of

10  my paper I submitted to the Court where I describe the

11  two videos that we were able to obtain metadata for,

12  those are both in August of 2017.  I believe for one

13  of those I inadvertently wrote August 3, 2018.

14       THE COURT:  Right.  Okay.

15       MR. ELLIKER:  Other than that, there are no

16  other corrections or objections.

17       THE COURT:  All right.

18       MR. ELLIKER:  Thank you.

19       THE COURT:  All right.  Ms. Grady, do you

20  have any other objections, corrections, or amendments

21  to the presentence report?

22       MS. GRADY:  I do not, Your Honor.

23       THE COURT:  And you don't object to the

24  changes proposed by the United States?

25       MS. GRADY:  I do not.

1          THE COURT:  So I'll direct that the probation

2     officer make those changes and correct the minor

3     issues with the presentence report and file a new one.

4          Ms. Grady, have you had a sufficient

5     opportunity to review with your client everything

6     about this proceeding and answer any questions he had

7     before you came into the courtroom today?

8          MS. GRADY:  Yes, I have, Your Honor.

9          THE COURT:  And have you been able to go over

10    with him the presentence report including the

11    information about the terms of supervised release?

12         MS. GRADY:  Yes, I have, Your Honor.

13         THE COURT:  And have you informed him the

14    positions that you're taking?  I have to say I'm a

15    little confused because you don't object, but then you

16    seem to be making a variant motion based on the

17    guidelines.  But have you gone over your position with

18    him?

19         MS. GRADY:  Yes.  I'm sorry that the Court's

20    confused.  Maybe I'm confused about what the Court's

21    confused about.

22         THE COURT:  Well, you don't object to the

23    application of the guidelines, but you then seek a

24    variant sentence essentially for double counting,

25    which is really a guideline issue.

1          MS. GRADY:  Right, correct.  It's not a legal

2     double counting.  So it's not a legal objection.  It's

3     more of a showing how the guidelines were increased,

4     therefore the Court could vary downward in order to

5     make up for that.

6          THE COURT:  All right.

7          All right.  Thank you for that.

8          So, Mr. Donelson, I need to confirm with you,

9     did you have plenty of time to go over the information

10    in the presentence report and ask your attorney any

11    questions you had about it before you came into the

12    courtroom today?

13         THE DEFENDANT:  Yes, ma'am.

14         THE COURT:  And did that include going over

15    the terms of supervised release that are in the

16    presentence report and ask any questions about those?

17         THE DEFENDANT:  Yes.

18         THE COURT:  And do you understand the

19    position that your attorney is taking, that she's not

20    objecting to the calculations, but she's seeking a

21    variant sentence?

22         THE DEFENDANT:  Yes, ma'am.

23         THE COURT:  All right.  So you all may have a

24    seat and I'll make my initial findings.

25         Having reviewed the information in the

1   presentence report and the positions of the parties, I

2   make the finding that I can adopt the factual findings

3   in the guideline application and the presentence

4   report, which leads to a recommended guideline

5   provision of 324 to 360 months' imprisonment based on

6   a total offense level of one, and a criminal history

7   category of I, a term of supervised release of five

8   years to life, a fine of 50,000 to $250,000, a $100

9   special assessment, and a potential assessment of up

10   to $5,000.  So those guidelines are adopted.

11          Okay.  I'll hear any arguments or

12   presentations that the parties want to make.

13          Ms. Grady, do you want to start because

14   you're seeking a variant sentence?  We can go over the

15   3553 factors and the variant sentence at the same

16   time.

17          MS. GRADY:  Yes, Judge, that will be good.

18   Thank you.

19          Even though I can speak loud, arguing with a

20   mask on seems like talking to a judge sitting down.

21   It's just a hard thing to conceptualize.

22          THE COURT:  Just feel free to -- we have, you

23   know, wipes up there, and you can make everything

24   sanitized.

25          MS. GRADY:  Thank you, Judge.  I will make

1    sure I do so for Mr. Elliker.

2            This is a difficult day.  This is a difficult

3    day for a lot of folks.  It's a difficult day for

4    Mr. Donelson.  It's a difficult day for the victim and

5    the victim's family, the victim's family who is

6    present today, my client's wife is present today,

7    Pastor Bill, who wrote a letter that was attached.

8    He's the gentleman who raised his hand.  He's nodding

9    right there.

10           There's also a few folks from Mr. Donelson's

11   church, which is, I believe, Pastor Bill's church, as

12   well as his mother is present.

13           So this is a day that I don't think anybody

14   in the courtroom who knows Mr. Donelson would believe

15   would ever be happening.  From the letters that are

16   attached to the position on sentencing and the variant

17   sentence, they said things like, When the allegations

18   towards Kellen were made public, I, along with the

19   congregation, was shocked.  He had never displayed any

20   behavior traits of that nature in his work or worship

21   here in the church.

22           I think his mother indicated that I've never

23   seen or heard of anybody -- of him disrespecting

24   anybody.

25           And I think it was his -- this was extremely

1   heartbreaking.  It hit like a ton of bricks.  That was

2   Jennifer Barryman, who's one of his close cousins.

3          So it is quite an occasion, and I know that

4   I've briefed this, and I'm not going to argue each and

5   every finite sentence.  I'm taking the general

6   approach, which is that Your Honor is well prepared

7   for this.  You've read the presentence report.  You've

8   read the positions of parties, and I'm sure that you

9   have in mind an idea or at least a range of what you

10  are considering doing in this case.

11         As you know, I've asked for a sentence of 180

12  months, which is 15 years.  That is the mandatory

13  minimum.  That is a sentence that Congress, when they

14  created this law and created the punishment range,

15  found that there are cases that are appropriate for a

16  15-year sentence.  They wouldn't have created a

17  15-year minimum if there weren't cases that they could

18  have envisioned being not worthy but sufficient

19  punishment for somebody.

20         This is somebody, as Your Honor knows from

21  the pleadings and from the letters, that has no

22  previous criminal history, no substance abuse history,

23  no substance use history, no mental health history or

24  conditions.  He's well educated.  I think a number of

25  the letters indicate that he's the first male in their

1   family to attend college and graduate.  He had been

2   working toward his master's.  He has some classes

3   towards that.

4         He was well respected in his community.  He

5   was a beloved teacher, music teacher.  He was a

6   beloved track coach; I think hurdling.  I think it's

7   fair to say that the entire communities in which he

8   operated were shocked by this kind of news.

9         Regarding the events themselves, as Your

10  Honor knows, the videos were taken in August of 2017.

11  There were activities prior to that which are included

12  in the presentence report because it's relevant

13  conduct, but it's of different conduct.  There was

14  some web searches.  There were some conversations

15  through various apps, and there was the possession of

16  child pornography that I believe the mother of his

17  first child noted that he was looking at pornography,

18  adult pornography.  That was one of the reasons why

19  they broke up.

20        The United States likened his conduct as

21  starting in 2011 and going through the day before or

22  the day of his arrest.  And we spent some time going

23  through what would have been the prior conduct,

24  because that's certainly something that Your Honor

25  will and is allowed to take into account.

1          The conversations that are contained in the

2     summary paragraphs, which really starts on paragraph,

3     in the presentence report, paragraph 17 and goes

4     through 22.  These are -- the paragraphs are pretty

5     particular and worded to show the extent of the

6     conversations and that it wasn't one continuous act

7     from 2011 to 2018.

8          There were visits to the website.  I'm

9     referring to paragraph 20.  There are visits to the

10    website in December 2012, January 2013, February 2013,

11    and then a whole year and a half later in September of

12    14, and then a year and a month later in October of

13    '15, and then two years later in December '17, and

14    then in June of '18.

15         So as much as they want to paint -- the

16    United States is painting him with a brush, I would

17    submit that it's not as broad or as consistent as the

18    United States may argue or certainly implied in their

19    paperwork.

20         And the reason I bring this up is that nobody

21    saw this in Mr. Donelson because it wasn't a daily

22    occurrence.  This wasn't something that happened every

23    day.  He certainly has tremendous regrets for his

24    actions.  When the agents came to his house, he

25    confessed.  When they asked for a password for his

1   phone, he gave it to them.  He gave them permission to

2   search the house.  He was somebody that maybe

3   seemingly needed to confess.  When they asked for the

4   password for his password-protected app where many of

5   the photos were, he gave that to them.

6          So he's somebody who was ripe for coming to

7   an end of that kind of conduct and being punished for

8   it.  He's been incarcerated since December 5th of

9   2019, and he will be incarcerated for the foreseeable

10  future.

11         One of the things that I wanted to bring to

12  the Court's attention is the 3553(a) factors.  It's

13  the fact that 15 years, we submit, is sufficient

14  punishment.  As Your Honor knows, sufficient -- one of

15  the factors is that the punishment needs to reflect

16  the seriousness of the offense.  And this is

17  serious -- is a serious offense.  But Congress said

18  that a 15-year sentence could be sufficient.  Congress

19  also said a 30-year sentence could be sufficient.  So

20  the difficulty is to figure out how much punishment is

21  sufficient for Mr. Donelson.

22         The guidelines are high.  They're high

23  because they take into account all the factors.  But

24  as I noted, and as the Court noted when we started the

25  hearing, one of the things that is always in these

1  cases is that one fact hits a couple of boxes.  And in
2  this fact, the person was below 12, and there was also
3  a toddler involved.  Both of those were counted.  And
4  it's not a double counting argument, a legal double
5  counting argument, but the counting of those two facts
6  that hit different boxes really increased his
7  guidelines pretty significantly.  By my count, the low
8  end of the guidelines went from what it could have
9  been of 210 months up to 324.  I think that's 114
10 months that it was increased.  Still, even with the
11 guideline range that I suggest might be more
12 appropriate, that's still above the mandatory minimum
13 in this case.
14         Could Congress have decided that a 15-year
15 sentence was sufficient for somebody who had no
16 previous criminal conduct, for somebody that had a
17 tremendous amount of contribution to his family, to
18 society, to church as a minister, as a music provider
19 of joy within the church service, for somebody that
20 took the underpaid, worked-too-hard kind of job as a
21 teacher?  Maybe that's what Congress intended for the
22 15-year sentence.  For somebody that didn't carry
23 everybody through the process, that when Mr. Donelson
24 was arrested and the analysis wasn't done on his
25 computer or on his phone, he voluntarily extended the

1    time for the government to indict.

2         And, obviously, there was a self-serving

3    interest in that, but his actions were showing that he

4    never contested that what he did was wrong, and he is

5    ready for punishment, and, as I said earlier, today's

6    the day.  And I should say the legal punishment

7    because he's been punishing himself since his arrest.

8    He's had a very difficult time with his wife.

9         His wife at the time that he was incarcerated

10   was a number of months pregnant, and she has since had

11   their child, and he was not able to be there because

12   he was incarcerated.

13        Some of the punishment that Your Honor will

14   mete out today is obviously time, but there's other

15   things that are inherent in that punishment that I

16   think the Court can take into account when you're

17   trying to figure out what is sufficient but not

18   greater than necessary.

19        Obviously, he'll be a felon.  He'll lose his

20   right to vote.  He'll loss his right to hold public

21   office, for whatever that's worth, serve on a jury.  I

22   don't think losing his right to possess a firearm is

23   that big of a deal.  He seems to be a very non-violent

24   individual, and everybody said he's non-violent.

25        He's lost his career, I think both teaching

1   and possibly in the ministry.  Certainly the

2   restrictions that are placed on folks who are

3   convicted under this statute will mean that he'll have

4   minimal contact with the church if there are folks

5   under the age of 18 in the congregation.

6        I think, as he has said and as other folks

7   have said, he's lost his self-respect.  He's riddled

8   with guilt and shame.  And he has a very powerful

9   faith, and thankfully he's not lost the faith that

10  somehow things will be okay in the end.  Somehow he'll

11  figure out a way to get back into society or figure

12  out a way of what is his new society based on after

13  the time that he has served.

14        To go back to one thing, Your Honor, that the

15  United States and I were talking about the offense and

16  whether they could prove that these videos were

17  distributed, the United States can't.  And I think

18  that that's a -- and we sort of joked that, believe

19  me, if they could find it, they would, because that

20  aggravates the offense.  Taking pictures of a minor

21  and then distributing them is a whole different

22  ballgame, and it increases the guidelines as well.

23  But I think that if they could have, they would have.

24  And since they don't have proof, I think Your Honor

25  can assume that these photos were never -- and videos

1    were never distributed.

2          THE COURT:  You're not contesting that the

3    conduct involved showing the videos to the victim, are

4    you?

5          MS. GRADY:  Yes, actually.  The United States

6    is unable to determine the photographs that were shown

7    to her -- if I can just have one second.

8          When the United States and I were discussing

9    these offenses, and they circled back around to the

10   minor child, the victim did not indicate or could not

11   describe the nature of the photos, and Mr. Donelson

12   would vehemently deny that he ever showed her photos.

13         He took a variety of pictures of a child, as

14   any person would, but there's no indication that she

15   was shown photographs that he had taken of her that

16   would be the subject of the offense.

17         THE COURT:  Just a minute, please.

18         MS. GRADY:  Yes.

19         THE COURT:  All right.  Thanks for clarifying

20   that.

21         MS. GRADY:  You're welcome, Your Honor.

22         There seems to be, by all account from the

23   minor's family, that nobody knew that these events

24   were going on, and that leads to some of the guilt and

25   shame that they expressed in their victim impact

1   statement, but I think it also goes to show that she

2   was not exhibiting the nightmares and the other

3   repercussions until after her father was arrested

4   because everyone did not know that anything was going

5   on or didn't see anything that was going on until

6   after his arrest.

7          The other 3553(a) factors, if he receives a

8   15-year sentence, plus his age of 32, he would be

9   released in his mid to late forties.  Both children

10  that are in his family would be -- one would be 15 and

11  one would be over the age of 22, I believe.  So she's

12  now seven.

13         The United States argues in their position

14  that he continued to do this, and it's only because

15  they couldn't figure out the dates from a phone that

16  didn't have the metadata in the files.  I don't think

17  that it's a reasonable inference that if Mr. Donelson

18  confessed when approached and told them what he had

19  done and told them that he stopped in August of 2017

20  regarding the filming of the minor, that it's a

21  reasonable inference to suggest that he continued to

22  do it and they just couldn't find the pictures.  And

23  that is an argument that the United States is asking

24  Your Honor to adopt so that you can punish him for

25  behavior that isn't in the record in terms of further

1   videos after August of '17.

2           There's certainly child --

3           THE COURT:  So I want to be clear.  I mean,

4   certainly the videos were still on his electronic

5   devices, right?

6           MS. GRADY:  Yes.

7           THE COURT:  So at the time he still had the

8   videos that he produced.

9           MS. GRADY:  That's correct.

10          THE COURT:  And that was 11 videos?

11          MS. GRADY:  That's correct.

12          THE COURT:  And he produced 27 pictures of

13  the victim?

14          MS. GRADY:  That's correct.  Twenty-seven, I

15  believe.

16          THE COURT:  Right.  I thought that's what I

17  said.

18          MS. GRADY:  I'm sorry.

19          THE COURT:  But then there are also these

20  other 30 videos and a thousand pictures.  Are those --

21  what is your argument as to the time frame of those?

22          MS. GRADY:  We don't have dates on some of

23  those, but we do have dates for the photographs that

24  were related to the 5C iPhone.  And we also have

25  photographs that were found in the 8 Plus, and the

 1   dates of those photographs from a discovery that was

 2   provided by the United States, the last viewing of

 3   photographs, I believe, was December 4th of 2019.  So

 4   that is correct.

 5        And so I guess I should have been more

 6   articulate that there was no further videos taken of

 7   the minor after August.  Certainly no proof of that.

 8   But, yes, the conduct of viewing child pornography did

 9   continue.  And I didn't mean to imply that that hadn't

10   continued.

11        THE COURT:  I was just being clear about what

12   your position is.

13        MS. GRADY:  Yes.  So, in looking at the other

14   factors, Your Honor obviously has to impose conditions

15   for the Bureau of Prisons to take care of

16   Mr. Donelson's medical or mental health or the

17   counseling that is mandated by statute.  Mr. Donelson

18   will need some vocational training because he will

19   need to have a different employment upon his release.

20        He will need -- I guess that's just it.  He's

21   going to need some mental health counseling to deal

22   with his issues and self-examination aside from what

23   the prison will provide towards folks that are

24   convicted of his offense.

25        I have asked that Your Honor not impose the

1    $5,000 special assessment and that is towards the end

2    of the presentence report.  I believe it's paragraph

3    76.  That the special assessment of $100 is mandatory

4    and the Court shall assess $5,000 per count unless the

5    person -- on any non-indigent person.  And in this

6    case, the United States agrees, from the presentence

7    report, that he's indigent, and that any further

8    fining, obviously there's a fine that's suggested, I

9    would not ask for that as well, because all that is is

10   punishing the family who sends money to him over time,

11   and I don't think that was the intent of the statute.

12   If somebody had money, they intended to punish them

13   for that.  But he has, as previously argued, lost

14   everything, and so he will have to deal with all of

15   those things, and hopefully his family will remain

16   supportive as they are today.

17          I think his mother's letter was really

18   touching.  I think the cousins' letters were touching.

19   They were all really telling of a different person

20   than the person that is here today for the crime that

21   he confessed to and the crime that he pled to.

22          Lastly, Your Honor, the -- as the Court is

23   aware, you are to impose a sentence that is sufficient

24   but not greater than necessary.  And in this case, 15

25   years is a significant sentence for somebody who never

1    spent a second behind bars.  Fifteen years would

2    recognize his good qualities, his positive

3    contributions that he has made.  Fifteen years would

4    allow him to return to society and contribute in a

5    meaningful way without being beyond the pale of being

6    employable or beyond the pale of having any support

7    because older family members could have passed on or

8    moved away with a 30-year sentence.

9         I made mention of the fact that the Court,

10   obviously, has to issue a sentence that is a deterrent

11   to himself and to others.  A 15-year sentence for

12   somebody that's never spent any time in prison, and,

13   as Mr. Donelson indicates, is a really significant

14   sentence and will significantly deter him.

15        I'm not certain, given how many years courts

16   have been giving out these high sentences, I'm not

17   certain that any one sentence, one newspaper article

18   such as today and will probably be tomorrow, that

19   that's going to deter anybody.  So I think that the

20   individual deterrent effect to him could be satisfied

21   with a 15-year sentence.  The general deterrence I

22   don't think will -- this sentence won't deter anybody

23   from doing this kind of harm in the future because it

24   has been going on, and they continue to do harm.

25             One other thing I think that the United

1   States -- I have it marked.  If I could just have one

2   second, Judge.  I think all of the factors that I've

3   discussed in the brief all support the sentence of 15

4   years.

5          The United States -- in closing, the United

6   States did make remark or somebody made remark that

7   this can't be the only person that he has done this

8   to.  But with the newspaper articles, with his arrests

9   and the requests for anybody in the community to come

10  forward, and now the absence of that information

11  before Your Honor seems to indicate that this minor

12  child was the only victim, and, of course, her family,

13  in this case.

14         So the internet has been such a vital part of

15  our life, and it's also just been a really horrible

16  thing.  And Mr. Donelson's thoughts previous to the

17  internet from 2011 to 2015, 2016, never would have

18  been known.  People say things on the internet.

19  People say mean things.  They say stupid things.  They

20  say things in haste.  We see that across the country

21  in terms of the online atmosphere.  And he had some

22  periods of time that were online atmosphere, and

23  obviously he did something about it, and he deeply

24  regrets that.  He has deeply regretted that from, he

25  says, when he stopped his behavior in August of '17.

1          I think all of these factors do support a

2     variant sentence or a downward variance down to 180

3     months.  Your Honor can certainly continue the

4     punishment of restrictions by placing him on a lengthy

5     period of supervised release and impose all of the

6     restrictions under the law so that he can be managed

7     in a less restrictive environment after 15 years of

8     what will be very, very difficult time for him, Judge.

9          Thank you.

10          MR. ELLIKER:  Good morning, Your Honor.

11          THE COURT:  Good morning.

12          MR. ELLIKER:  I think, like Ms. Grady said,

13     all of us can agree this is an awful case, and we all

14     wish we weren't here for this.  In particular, I think

15     the folks who have that strongest desire are the

16     parents, the mother of Minor One, who's here in the

17     courtroom with her parents, the maternal grandparents

18     of the victim.  They've submitted statements to the

19     Court that I know that you have reviewed and do not

20     wish to address the Court today but wanted to make

21     sure that you understood that they were present here.

22          I understand Ms. Grady's argument about the

23     level of detail in the presentence report that goes

24     beyond the specifics of the production conduct that

25     Mr. Donelson pleaded guilty to in the criminal

1  information.  I think the importance of that is

2  showing not that he is to be punished for things that

3  happened on the internet 10 years ago, but to show the

4  level of premeditation and thoughtfulness that went

5  into this over a number of years, and not just a

6  generic proclivity towards pornography, but a very

7  specific interest in the specific conduct that's at

8  issue in the production itself.

9        As Your Honor knows, this investigation of

10  Mr. Donelson began last year when two messaging

11  applications, Snap Chat and Kick Messenger, submitted

12  tips to the National Center for Missing and Exploited

13  Children regarding a user who had uploaded child

14  pornography in August of 2019.

15        The agents were able to quickly triangulate

16  that information around Mr. Donelson, and they

17  obtained a search warrant for his home.  Ms. Grady

18  said that Mr. Donelson consented to the search of his

19  home.  I think that it's actually better to say that

20  he did not resist the execution of a search warrant

21  that was legally obtained for his home.

22        He did willing give up the passwords to his

23  devices and cooperate, and, to his credit, I think

24  probably seeing what was happening, very quickly

25  admitted what was going on and was able to identify

1    particular images and videos he had produced with the

2    minor, which is relevant because of the fact that --

3    regarding the metadata issue, the way that he stored

4    the material he produced with the minor was on his

5    password-protected phone.  He used a

6    password-protected application.  And within that

7    application, there were password-protected folders.

8    Three layers of protection for this material,

9    including material that he had produced with the

10   minor.

11          Because of that triple layer, the forensic

12   tools that we were able to use from the Virginia

13   Office of the Attorney General who did the forensic

14   examination, despite numerous attempts was unable to

15   get the metadata from those videos and photos, which

16   existed only within those applications.

17          And so the reason that I wanted to emphasize

18   that was just to say the photos he was walking around

19   with in his pocket on the phone he was still using on

20   the day of his arrest, we don't know when those were

21   created.  The ones that we do know and were the basis

22   for the -- the one that was the basis for the criminal

23   information, and then there's another one from that

24   same -- about 12 hours earlier, we have from an

25   archived backup on the laptop that agents seized from

 1   a phone that he didn't use anymore.

 2          And so that's why there's so much emphasis on

 3   the metadata issue.  And I think that -- I mean we

 4   ultimately, I think, are at an impasse about what to

 5   do about that metadata.  I mean, I think that Ms.

 6   Grady has an argument that serves Mr. Donelson

 7   regarding our inability to say anything about after

 8   August of 2017, but at the same time I think there is

 9   a little bit of a logical sense to saying if there's

10   material that you have on your phone that you have in

11   your pocket on the day you were arrested that was not

12   on the archived back up from 2017, it seems entirely

13   plausible that that material was produced after that

14   date.

15          At the end of all of this, though, Your

16   Honor, we're not asking you to sentence him based

17   on -- we're not asking you to increase his sentence

18   based on production after 2017.  It's really more

19   relevant to consider that the nature and circumstances

20   of this offense show a trajectory that started in 2011

21   before he had access to this child who was born in

22   2013, was engaging in conversations and internet

23   behavior showing a specific interest in this kind of

24   abuse.  And then over the years, clearly that

25   escalated.

1          There were times when, from the internet
2    history that we're able to identify from the
3    examination, that it shows that there's little periods
4    where he's visiting websites and then certainly gaps
5    where he's not.  But after a certain point he had, at
6    times, unfettered access to this child.
7          Regarding -- and so I think that Your Honor
8    understands that I take Ms. Grady's point about people
9    saying things on the internet and getting into
10   situations that they're talking about things and
11   finding themselves in conversations on message boards
12   that they maybe didn't intend to late at night and
13   that kind of thing, but this seems something wholly
14   different than I believe what she said, mean things
15   and stupid things that people say on the internet,
16   plotting out a particular course of conduct, engaging
17   in conversations with other people sort of trying to
18   either amp himself up or find other people who are
19   willing to help him get to this point that he can
20   engage in this kind of sexual abuse.
21          In terms of the defendant's history and
22   characteristics, it's clear that there are two sides
23   to this individual, that there is a public persona, is
24   the way that I would put it, of someone who is a
25   devoted member of his church and a music minister,

1  someone who is clearly a doting and loving son and

2  cares very deeply about his family and the people who

3  are in his life.

4        On the other hand, it's also indisputable

5  that in secret there is this other person that exists.

6  And the scope of this activity over a number of years

7  shows that it was not some kind of one-off impulsive

8  behavior that happened.

9        And also I think it's worth noting that the

10  nature of this offense ties in with his particular

11  history and characteristics that he was very selective

12  about the minor that he abused, that he chose someone

13  over whom he had authority to engage in this kind of

14  conduct and kept that abuse a secret.

15        And even if you credit his statement that he

16  stopped doing this after August of 2017, as Your Honor

17  already noted, he had the material on his phone until

18  the day he was arrested.  So these are not isolated

19  incidents.  It's consistent behavior.  And this

20  dichotomy, obviously, Your Honor, I know you

21  understand, and we all understand you have to sentence

22  the whole person, but it's important to understand

23  that this is a side of him he didn't show to people.

24        In terms of the seriousness of this offense,

25  there's obviously a cycle of trauma that exists in all

1   child pornography offenses.  Any individual who's a

2   victim of child pornography is physically and sexually

3   abused.  There's a violation of trust between the

4   adult who does this abuse and then there's a further

5   violation of their privacy by recording the abuse.

6   And there can be, in certain circumstances, although,

7   as Ms. Grady is correct in saying, we don't have

8   evidence of distribution here, I should say that I

9   believe when I made my comment to Ms. Grady about

10  almost, you know, sort of saying, like, trust me.  If

11  we had found distribution, we would have let you know

12  is certainly because that makes it a more serious

13  offense but also because we have obligations to the

14  victim to make sure that if there was distribution of

15  child pornography, the victim has a right to know

16  about that, and there are certain things that I know

17  Your Honor is aware of that NCMEC becomes an

18  unfortunate regular part of that person's life going

19  forward when that material is discovered elsewhere.

20          Here, the defendant forced on a young child

21  sexual behaviors from a person that the child trusted

22  and even made games out of it.  I'm thinking, in

23  particular, of a video described in the PSR involving

24  glitter with a child on a penis and asking the child

25  to pick it off as though it's some kind of game

1    normalizing behavior.

2          I think that that actually probably goes much

3    longer to or points towards the point that Ms. Grady

4    made about the child only having nightmares after the

5    fact, after this conduct happens.  Well, I think that

6    that's explainable because of the fact that the child

7    didn't understand what was happening, was not in any

8    position to be able to put that into context and

9    understand this is something that should not be

10   happening.  And the defendant made a game out of that.

11         Specific to that, as Your Honor knows from

12   the minor's mother's victim impact statement, the

13   minor has been going through a tough time since the

14   truth came to light with nightmares and crying spells.

15   The child's not willing to communicate openly, does

16   not feel safe being left alone with the child's

17   grandparents.

18         I think that there's some quotes here from

19   the mother that are important to consider.  She said

20   that I don't have answers as to why the person who is

21   supposed to protect the child ended up betraying the

22   child's trust and is instead a person that the child

23   needs protection from.

24         Family members do not even feel comfortable

25   hugging the child out of fear how the child may react,

1    and the child has asked the mother -- this is -- I'm

2    sorry.  The mother wrote, in her own words, "This has

3    caused my own faith to wither, having my child ask me

4    why God would allow this to happen.  It pains me not

5    to be able to answer that question because I am trying

6    to find the answer myself."

7            Obviously, there's a need to protect the

8    public here.  Protecting the minor victim I think will

9    happen, obviously has been happening since the

10   protective order in this case prohibiting Mr.

11   Donelson's contact with the minor while these

12   proceedings are pending.  Going forward his

13   incarceration will continue to protect the minor, but

14   there's also a need to protect the public, both in

15   terms of his regular access to children, the positions

16   he held, but also there's a need to protect the public

17   even if he were not to be an elementary school teacher

18   or a music minister, there's a need to protect the

19   public from his child pornography offenses because

20   there's victims of that even if he were to sit alone

21   in his apartment viewing pornography.

22           In terms of avoiding unwarranted disparities,

23   I think this is probably one of my strongest arguments

24   against a variant sentence here, that if the Court

25   were to grant the variant sentence, that would cause

1    the very disparity that 3553(a) counsels against.

2           I was able to find one other case from the

3    Eastern District of Virginia.  It was several years

4    ago, in 2011, in front of Judge Freedmen in Norfolk,

5    but Mail, M-a-i-l, which was case 2:10CR174.  That was

6    a case involving a woman who created child pornography

7    with a 13-year-old over whom she had authority, and

8    the judge imposed the 360-month statutory maximum in

9    that case.

10          Other cases were for sentences, under this

11   statute, show lower than the statutory maximum but

12   much higher than the 180-month sentence that the

13   defendant is asking for for other conduct that is

14   abhorrent but certainly of a different kind than what

15   we're dealing with here.

16          The *Myrick* case from 2019 in front of Judge

17   Smith in Norfolk was from December of 2019 where a

18   gentleman, without ever having any sexual contact with

19   the minors, had two minors, ages 11 and 17, take

20   photos of themselves, send them to him, and then he

21   posted them on the internet out of revenge when he got

22   upset with them.  That defendant received a 20-year

23   sentence.

24          Judge Payne, last year, sentenced a

25   gentleman, his last name was Witt, W-i-t-t, a

1  30-year-old man who produced material while abusing 11

2  and 12-year-old victims.  That defendant received 292

3  months.

4       And, of course, as Your Honor knows from our

5  papers, the recommended range here, absent the

6  statutory maximum, would be 324 to 405 months.  So, in

7  effect, the statutory maximum is actually lower than

8  the midpoint of the otherwise recommended guidelines

9  range, which is, I think, a further reason why

10  departing or varying downward to 180 months would

11  create an inappropriate variant sentence.

12       Responding to a few of the defendant's points

13  specific to the variance in his position paper,

14  obviously the letters, I think it's indisputable, that

15  show that there are people in his life who love him

16  very much, which is very important.  At the same time,

17  without getting too specific, I think if you read some

18  of those letters closely, some of the virtues that

19  family members extol on Mr. Donelson show that they

20  don't actually know what he did.  They don't have a

21  full understanding of the conduct that has led him to

22  this court today or who the victim was.

23       And the idea that because he didn't

24  distribute, that mitigates against a sentence at the

25  high end of this range, I think it's true that we

1   can't -- I mean, I know it's true that we don't have

2   evidence that he distributed this, but had he

3   distributed it, that would have been a further

4   enhancement on his sentence.

5           So it's sort of asking for the lack of the

6   ability to impose the two-point enhancement somehow

7   means that we should go below the otherwise applicable

8   range I think is not a strong argument.

9           There was a specific argument in Ms. Grady's

10  position about whether Mr. Donelson -- in one of the

11  videos, the way that it was described, whether he

12  penetrated the minor's mouth in a video versus

13  something else, and I think we could stipulate to the

14  fact that there was physical contact between his penis

15  and the minor's mouth.  I'm not sure I understand why

16  any of that mitigates towards a variance in this case.

17          And, again, the idea that Congress had

18  determined there are offenses of this nature worthy of

19  a 180-month sentence, well, I think that's true.  If

20  you look at the way the guidelines run for 2251(a)

21  offenses, the base offense level is 32.  If you had

22  somebody that didn't have all of the additional

23  enhancements that apply to this awful case, you would

24  have someone with a criminal offense level of one, a

25  base offense level of 32, that leads to a range of 121

1    to 151.

2            So in that case, the Court would be required

3    to go above the guidelines range to the mandatory

4    minimum that Congress had imposed.  So I understand

5    the argument that Congress obviously intended there

6    were certain cases where 180 months could be an

7    appropriate sentence.  I just don't think this is that

8    case at all.

9            And then, by the same token, the suggestion

10   that there's a maximum sentence that should be

11   reserved for people with more criminal history or

12   repeat offenders or distributors, I think the

13   guidelines, which are not objected to, account for

14   exactly what Mr. Donelson did and the person that he

15   is based on his criminal history.  And that doesn't

16   come anywhere near the 180 mandatory minimum sentence.

17           And then lastly regarding this double

18   counting, not legal double counting, but the same fact

19   accounting for multiple increases, I think that that's

20   pretty obvious to explain that abuse of a toddler is

21   worse.  It's still terrible but worse than abuse of a

22   child who is older than that but younger than 12,

23   which is worse than a child who is older than that but

24   under than 18.

25           And so the fact that there's four points

1   added for a child under 12 and an additional four

2   points added for abuse of an infant or toddler just

3   shows how much worse that conduct is, not that it's

4   one fact that's doing inappropriate double work there.

5          Your Honor, I could go on about other things.

6   I know you've read the papers closely.  The last thing

7   I'll say is to the letter that was submitted by the

8   defendant to the Court, there's a lot that could be

9   said about that.  I think the main thing I want to

10  emphasize is that by my reading, there's no mention of

11  the victim or specifics about acknowledgment of the

12  harm caused to the victim of this crime.  Only a

13  letter about the defendant, the hardships that he has

14  faced as a result of this, the lessons that he thinks

15  he has learned.  And then he refers to, in the closing

16  of his letter, asking you to avoid imposing collateral

17  damage from something that has already been -- that he

18  said -- he's asking you to prevent an already

19  corrected wrong from creating collateral damage.

20          I don't think that that quite grasps the

21  situation that we're dealing with here.  I would never

22  diminish anyone else's personal journey, whether

23  that's by faith or any other creed or any other

24  personal belief system.  It's undeniably important.

25  But I think that the profound impact of this offense

1   goes beyond the own sense of forgiveness that

2   Mr. Donelson thinks he feels and that other members of

3   his family who may not actually really understand

4   what's happened here.

5          So for all these -- well, and the last thing

6   I'll say, Your Honor, about the special assessment.  I

7   agree, in previous conversations with Ms. Grady and

8   with the probation officer, the United States agreed

9   for purposes of that special assessment the defendant

10  could be considered indigent, but we would not concede

11  that he's indigent for purposes of restitution.  We do

12  intend within 90 days of sentencing to submit to the

13  Court a restitution request based on counseling and

14  therapy expenses for the minor.

15         For all these reasons, Your Honor, we ask for

16  the Court to impose a guideline sentence of 360 months

17  and a lifetime of supervised release.

18         Thank you.

19         THE COURT:  Ms. Grady.

20         MS. GRADY:  Just briefly, Your Honor.

21  Regarding Mr. Donelson's letter to the Court,

22  Mr. Donelson knows that there's a protective order.

23  Mr. Donelson knows that what he wrote to the Court was

24  going to be in the public record.  So I advised him to

25  not use any words that would be reflective of a

```
 1   violation of that protective order.  I'm not
 2   suggesting that I told him what to write, but what not
 3   to write in the letter regarding that.
 4            And the double counting issue, I don't know
 5   if I was not articulate enough, but a toddler is, by
 6   definition, also somebody under the age of 13 and
 7   under the age of 18.  So it doesn't make it -- it
 8   should be the reverse.  If it's a toddler, it should
 9   have an extreme number, and by adding the higher
10   numbers with the lower number, it creates a greater
11   number -- a greater enhancement is what I was trying
12   to say.
13            It's obvious that a toddler is also under 13
14   and under the other age.  So they're going to get all
15   the points.  That's what I was trying to make.  I
16   wasn't trying to say anything more than that.
17            And lastly regarding the layers of protection
18   in his application on his password-protected phone,
19   and I did say that he cooperated with the authorities
20   when they came to his house.  He gave the passwords
21   up.  I didn't mean to imply that he -- that he -- that
22   there wasn't a search warrant, but just that he was
23   open and honest with passwords, with folders.  Had he
24   not been so, we might still be fighting over the issue
25   of whether they could get into the phone, which
```

1   they've gotten into with his permission, that elevated

2   the nature of the offense and his relevant conduct by

3   all the other things that were on the phone.

4         So I know that Mr. Donelson wants to speak,

5   and I would remind the Court that he is an educated

6   man and has an interesting way of speaking.  You can

7   see that in the letter.  You can see that in the

8   letter that was attached to the United States'

9   position, but I would just encourage the Court to

10  listen to his feelings.  His words sometimes can be

11  pretty erudite.

12        THE COURT:  All right.

13        Mr. Donelson, I am prepared to impose a

14  sentence.  Is there something you want to say on your

15  own behalf?

16        THE DEFENDANT:  Yes, ma'am.

17        THE COURT:  All right.  If you want to

18  approach the podium, you may do so.

19        THE DEFENDANT:  Good morning, Your Honor.

20        THE COURT:  Good morning.

21        THE DEFENDANT:  I thank the Court for

22  providing me the opportunity to speak today.  I speak

23  sad and humbled, acknowledging that I'm not perfect.

24  Never have been.  Never will be.  As a result, I've

25  made some mistakes and I've learned shame.  And I've

1   learned regret.

2          My mistakes have caused pain for a special

3   group of people that I care for, and for those

4   mistakes I sincerely apologize and ask them to forgive

5   me.

6          Standing humbly, I understand that the weight

7   of my mistakes have come with a heavy burden of

8   incredibility.  There's now an incredible amount of

9   anxiety and embarrassment because of me, an incredible

10  wall of distrust towards me, and incredible fountains

11  of speculation and suspicion about me.

12         I also understand that the mistakes have even

13  created in others hate of me.  For all of those things

14  that were caused by me, I'm wholeheartedly sorry.

15         It was never, ever my intent to cause this

16  moment in time.  I am fully ashamed and regret

17  everything about this moment.  If I could be given a

18  pencil to erase my mistakes, I hastefully would.

19         I regret letting down all of my students and

20  youth at church who may have looked up to me.  I

21  regret falling as a member of the overall Christian

22  family.  I regret causing this calamity in the lineage

23  of my family.  I regret not being strong enough to

24  overcome this temptation soon enough.

25         To my wife, I'm sorry for having baggage in

1   my past that now prevents me from being the husband

2   you love, the one you need and the one with whom you

3   wanted to begin and raise a family.  Bonnie, I'm

4   sorry.

5           Being confined behind the wall which left you

6   alone to deal with the roller coaster of a first-time

7   child delivery and seemingly overall parenting.

8           To my little bear who I've never met, I'm

9   sorry that I won't be there.  And I'm sorry that I

10  won't be around for you to enjoy the wonderful life of

11  growing up living with Mommy and Daddy.

12          To another one who's also dear to my heart,

13  I'm so sorry for every single thing that I did wrong,

14  things that destroyed the living in two of your happy

15  homes.

16          I regret that I wasn't able to tell you why,

17  to tell you there's no need for you to cry because

18  it's not your fault at all.  It's mine.

19  Unfortunately, time has to pass, sweetpea, but I hope

20  and pray that you'll find room to forgive me some day.

21          Your Honor, in light of my mistakes, I ask

22  for forgiveness and mercy.  Mistakes are very few in

23  my history, and they certainly do not attest to the

24  true nature and totality of me.

25          I have a record that's completely clean.

1    This group of incidents are regretted anomaly.  And

2    the volume of good I've done reflects what's normal to

3    me, my purity.  My purity is truly who and what I am.

4    My purity illustrates how, though a member of the

5    underpaid educating class, I still managed to work in

6    the classroom effectively and efficiently.  My purity

7    leaps of my enthusiasm on the track field as a coach

8    who led his sprinters and hurdlers to state level

9    competition.

10          My purity sings octaves of my accomplished

11   musicianship from advanced childhood ability to

12   adolescent peer group superiority to being the only

13   student composer in the state of Virginia to ever

14   compose a high school fight song.

15          My purity still sings of my bachelor of arts

16   and music degree along with 20 plus years of public

17   performance with over 10 years spent performing across

18   this country.

19          My purity adores how I've always been the

20   golden child to a single parent mother.  And it mourns

21   of how I held my daddy's hand during the last few

22   weeks until his death, even though he wasn't there at

23   all to hold my hand in life.

24          My purity laments of how I've been a devoted

25   husband and how I've always wanted nothing else in

1   life more than being a dedicated father.

2           My purity prophesies of how I'm a passionate

3   minister of the gospel.  It rejoices at the lives I've

4   led to Christ, the individuals I've baptized, and the

5   gifts of music, preaching, teaching, and knowledge.

6   I've always been willing to share with anyone willing

7   to listen.

8           If talk is cheap and if actions speak louder

9   than words, Your Honor, please don't rob me of the

10  chance for my actions to prove my sincerity and my

11  apology and to prove my desire and yearning to live

12  righteously.

13          Life is short, and I've learned in jail that

14  every day spent behind the wall is one less day

15  available to act accordingly.  Despite what people may

16  think or say, I'm certainly not a devil or a demon.

17  I'm a great man with weaknesses.  One of those

18  weaknesses provided influence to make bad decisions.

19  No different than any other process of mistakes made

20  by human beings.

21          At this moment I'm reminded of the Apostle

22  Paul who in his Roman's letter said to the church,

23  "All have sinned and fall short of the glory of God."

24  However, though we all presently fall short, the good

25  news is that none of us fall short of his forgiveness

1  and grace.

2          When confronted about the parameters of

3  forgiveness, Christ said two things that ring relevant

4  to me now:  He who is without sin cast the first

5  stone.  And don't just forgive seven times, but

6  forgive 70 times seven.

7          In other words, Your Honor, Court, all of us

8  have been in need of, are currently in need of, or

9  eventually will be in need of forgiveness.  As a

10  consequence, we should all be eagerly willing to

11  forgive others as much as it takes and as long as it

12  takes.  After all, I believe Christ felt so passionate

13  about us forgiving others that he died just to teach

14  us to extend it.

15          So, Your Honor, I stand now full of remorse,

16  sincere sorrow, relentless remorse, and wholehearted

17  apology for every ounce of disappointment, disarray,

18  displeasure, and distaste that my mistakes have

19  caused.

20          It's a commonly accepted belief that everyone

21  deserves a second chance.  I, too, stand asking for

22  forgiveness, for mercy, and for the second chance that

23  they bring.

24          Thank you.

25          THE COURT:  All right.  Mr. Donelson, I'm

 1    prepared to impose the sentence.  You may stand at the

 2    podium.

 3              So, as I review any sentence imposed by the

 4    Court, I need to take into account certain factors

 5    that are listed in a statute, which the attorneys have

 6    been speaking about here, under 18 U.S.C. 3553(a).

 7              Sir, do you need some water?

 8              THE DEFENDANT:  No, I'm fine.

 9              THE COURT:  And that requires me to take into

10    account the nature and circumstances of the offense

11    and the history and the character that you bring to

12    the Court, to impose a sentence that is sufficient but

13    not greater than necessary to comply with the statute

14    which asks that I reflect the seriousness of the

15    offense, promote respect for the law, provide just

16    punishment, afford adequate deterrence, and protect

17    the public from further crimes, and take into account

18    needed educational or vocational training or

19    correctional treatment, and also consider the kinds of

20    sentences that are available, and avoid unwarranted

21    sentencing disparities.

22              So, clearly, Mr. Donelson, what we have in

23    front of us is a terrible case.  And I regret even

24    thinking of it as a case because these are human

25    beings, including you, that have been involved in

1    unimaginably painful events.

2         I will be clear that it is significantly more

3    painful for the minor victim than for you, despite all

4    the remorse you have, and certainly for the folks in

5    the minor victim's life who are experiencing their own

6    guilt at feeling as if they failed at protecting the

7    child.

8         So I'm first going to address the double

9    counting issue.  I think that your attorney is asking

10   for a variant sentence not just based on this, but on

11   other factors as well.  But the legal issue I have to

12   address or the factual legal issue I have to address

13   is that she's saying that because there's an

14   additional four points under the guidelines if the

15   victim is under 12, and then another additional four

16   points under the guidelines for a victim who is a

17   toddler, that it's essentially double counting.  So

18   every toddler is also going to be under 12.  And that

19   really -- it's not double counting under the law, but

20   it sort of goes without saying that a toddler is going

21   to be younger than a 12-year-old who's going to be

22   younger than somebody who is 19.

23        I certainly make the legal conclusion that it

24   is not double counting, and I am going to reject the

25   latter part of the argument, too.  Certainly the

1    Fourth Circuit has addressed the issue of double

2    counting in similar circumstances, but under an

3    earlier guideline set in *United States vs. Dowell*,

4    D-o-w-e-l-l, which is at 771 F.3d 162 at 170.

5            And what the Court has found and the

6    guidelines indicate is that there's a presumption that

7    double counting is proper where it is not expressly

8    prohibited by the guidelines.  And the Court has also

9    found that the offense level adjustments from more

10   than one specific offense guideline are applied

11   cumulatively unless otherwise noted.

12           Now, the only instance where double counting

13   could occur under the statutes, the guidelines that

14   we're talking about, is if there were a different -- a

15   Chapter 3 vulnerable victim enhancement, which has not

16   been applied here.  And so I certainly make the

17   finding that the guidelines are correctly calculated,

18   but I also make the finding that the type of conduct

19   and criminal activity we're talking about here is

20   inherently worse involving a toddler than a

21   12-year-old.  And so I think it's bad enough for a

22   12-year-old, somebody who's prepubescent, that's how

23   the guidelines reach essentially that age, and it is

24   inherently worse with a baby.  And so I am rejecting

25   that argument out of hand.

1        So, it is clear to me that the difficulty

2   that many of your family members and that clearly you

3   are having with addressing this conduct is that there

4   are so many instances of different conduct that's just

5   extremely good.  I've read the letters from your mom,

6   and your aunt, and your cousins, and your pastor, and

7   members of your church who talk about that you're a

8   good guy.  You have a lot of integrity; that you never

9   disrespected anybody; that you're an especially good

10  son.  You got yourself through college and were the

11  first male family member to do that in a family that

12  is bereft, has few male role models who still

13  participate in family business.

14        Clearly, you have a love for music and a

15  talent for teaching and ministry, which is evident in

16  the colloquy that you just gave me in this case

17  itself.

18        So the difficulty here is that this, even

19  presuming all of this stopped in 2017, it just wasn't

20  a one-time event, and it was repeated, and it was

21  severe, and it was recorded.  And I will say that the

22  recording is a separate level of criminal conduct

23  because the recordings, whether or not you share them,

24  and I'm presuming you didn't distribute them.  I

25  believe that the government says you didn't and your

1   attorney says you didn't.

2           The other thing, though, is you talked to me

3   about you wish you could erase -- if you had a pencil,

4   you could erase what you did, but you could have

5   erased the videos.  And there you are in December of

6   2019, and you still have 11 videos and 27 pictures of

7   this minor victim who you had total control over and

8   with whom you are supposed to have the kind of

9   relationship that a child needs to grow up in a safe

10  and healthy environment.

11          You also had a thousand other pictures and 30

12  other videos that were more recently identifiably you

13  had engaged in procuring them.  No doubt you did not

14  produce them.  But the dissonance between what I hear

15  you say of yourself and what this conduct is is

16  striking.  And it may, unfortunately, evince, suggest,

17  that you haven't fully absorbed what you did.

18          You talk a lot about being ashamed, about

19  being embarrassed, about seeking forgiveness, that we

20  all need to forgive, and all of us are sinners, and

21  all of us need to know that at some point we're going

22  to have to crawl out of the mistakes that we made, but

23  when I read the letter, for instance, that you wrote

24  me, you're talking about a bad decision made years ago

25  as if it's just done because you have forgiven

1    yourself.  You believe that God has forgiven you, and

2    I hope that God has forgiven you, but that's not the

3    end of the victim's experience here.  The victim is a

4    victim for life.  That child is a victim for life.

5    That child has received a life sentence and the person

6    who perpetrated it against her couldn't be worse.  It

7    couldn't have happened from a worse source.

8          So when I see you use phrases about a bad

9    decision made years ago, about what -- how Satan

10   brings himself into your life without knowing, without

11   your being able to protect yourself, and talking about

12   dissonant things, saying things were going great

13   because God blessed me with a brand new car, a higher

14   paying teaching position in a different school

15   district, and he blessed me with the ability to

16   relocate, and then associating problems with the fact

17   that you received a pay cut, and other issues, and you

18   were right on the verge of becoming the youth pastor

19   that you had dreamed to be when this arrest happened.

20         That really is an awful lot about you.  And I

21   understand that we're in an awkward position here.

22   And, frankly, it frustrates me to no end.  It's

23   appropriate because we don't want to talk in detail

24   enough with respect to any particular victim, but it

25   frustrates me not to be able to say exactly what you

1   did to your face and tell you how awful it is.  It's

2   not even close.

3          The notion that the United States is talking

4   about using games with glitter with a little child,

5   that's exactly the kind of insidious behavior that is

6   damaging.  I'm also going to tell you I have in front

7   of me letters that I may -- I think one letter may be

8   under seal, so I certainly can't quote it, but I want

9   you to know that at some point as recently as May, I

10  have a document that indicates that you wanted

11  permission to contact the victim.

12         And, you know, good on you that you're asking

13  for permission because there is a protective order,

14  but the notion that at any point right now you would

15  think that that was about anybody's wellbeing but your

16  own suggests that you have not fully embraced what

17  happened here.  And I unfortunately don't -- I believe

18  in mercy, and I believe in justice, but I also have to

19  have a sense that somebody who has sinned is less

20  concerned about others forgiving him than about

21  recompense to society and to the individuals whose

22  lives he has ruined.

23         You apologized.  I heard you do it.  But I

24  can tell you, Mr. Donelson, it's a little disturbing

25  how much of that was this isn't me.  This is what this

1 has done to me.  I am -- you talked about incredible

2 embarrassment to me.  People are speculating about me.

3 People hate me.

4    And while that follows a comment about pain

5 for a special group of people you really care about,

6 which I do believe, unfortunately the emphasis is on

7 the wrong syllable.  I just cannot -- I cannot get

8 past the number of photographs, the number of videos.

9    So let me tell you this, Mr. Donelson.  I

10 don't know how long any one of these videos were, but

11 we're hearing a lot these days about bad things that

12 get captured on film and how three minutes doesn't

13 seem like very long until you see something really

14 awful happening to somebody else.

15    So I can tell you, any video that's 30

16 seconds long, that's a minute and a half long, I

17 presume most of them were not nine minutes long, any

18 video is a witness to pretty close to torture when

19 somebody is a toddler and is non-consenting.

20    So I'm not going to grant the downward

21 variance.  I do think there is deterrence in learning

22 that needs to go beyond your faith, and that's up to

23 you.  I certainly don't think you should be released

24 from jail any time near where you have a child who is

25 15 or 22.

1          Part of what I need to do is protect the
2   victim from having to deal with you at any time while
3   that person is not a fully formed adult and able to
4   handle herself.
5          The United States is correct that the
6   statutory maximum here is functionally below the
7   midpoint of what the guidelines would be; that the
8   child is now exhibiting nightmares because there is
9   now an understanding of the person that she trusted
10  was abusing her rather than somehow it was normal is
11  something that needs to be taken into account.
12         The layers of protection, I would think,
13  frankly, just show intelligence as much as anything.
14  The issue for me, though, is that they were still
15  there.  If you wish you had a pencil to erase things,
16  you did, before you got caught, and you didn't erase
17  anything.
18         So I have read all the letters on your
19  behalf.  I see what a stalwart you have been for your
20  family, that folks talk about you being a shinning
21  star.  I read, though, folks saying that you have
22  apologized for your mistake, and then somebody
23  indicating that just because you did less than a smart
24  thing doesn't mean that the punishment here should be
25  extreme.

1              I think that the guideline, Congress has

2     taken into account the long-term nature of the harm

3     that this kind of conduct embraces independent of when

4     it stops.  If it stops in August 2017, if it goes

5     beyond, it's still there.  The videos are still there.

6     And the child still has, I think, a period of time

7     from when she was two to four that she's going to have

8     to deal with.  And so because the guidelines

9     functionally fall in the middle of the range, because

10    I want to protect the child and society from any

11    further crimes, I am going to impose a 360-month

12    sentence, Mr. Donelson, and a term of supervised

13    release to follow.

14              I believe that you can use that time as well

15    as --

16              (The defendant passed out.)

17              THE COURT:  I'm going to leave the bench.

18              (Recess taken from 12:38 p.m. until 1:03 p.m.)

19              THE COURT:  All right.  Ms. Grady, how is

20    your client?

21              MS. GRADY:  He feels better, Your Honor.  His

22    vitals were fine according to the folks from the

23    ambulance authority.  They advise that he stay

24    sitting.

25              THE COURT:  Of course.

 1          MS. GRADY:  But other than that, I've

 2     discussed if he wants to go forward or delay the

 3     matter, and he says he's fine to go forward, to finish

 4     the sentencing.

 5          THE COURT:  All right.  Okay.

 6          So, Mr. Donelson, I don't want you to stand

 7     up, and I do hope that you feel as well as you can,

 8     but I just need to confirm from you separately, are

 9     you prepared for me to pronounce the sentence?  That's

10     all we have left to do.

11          THE DEFENDANT:  Yes, ma'am.

12          THE COURT:  All right.  Okay.

13          All right.  Pursuant to 18, United States

14     Code, Section 3553(a), and having considered the

15     guidelines advisory, it is the judgment of the Court

16     that the defendant, Kellen Thomas Donelson, is hereby

17     committed to the custody of the United States Bureau

18     of Prisons to be imprisoned for a term of 360 months.

19          The defendant is remanded to the custody of

20     the United States Marshal and shall be given credit

21     for time served.

22          Is there a request to be local?

23          MS. GRADY:  Yes, there is, Your Honor.

24          THE COURT:  To the extent that the Bureau of

25     Prisons can accommodate the request, the Court would

1   order that Mr. Donelson be placed in the nearest

2   facility to Richmond, preferably FCI Petersburg.

3            Upon release from imprisonment, the defendant

4   shall be placed on supervised release for a term of 10

5   years.

6            Within 72 hours of release from custody of

7   the Bureau of Prisons, Mr. Donelson shall report in

8   person to the probation office in the district to

9   which he is released.

10           While on supervision, he shall not commit

11  another federal, state, or local crime.  He shall not

12  unlawfully possess a controlled substance and shall

13  not possess a firearm or destructive device.

14           He shall comply with the standard conditions

15  of supervised release as recommended by the United

16  States Sentencing Commission.  And as reflected in the

17  presentence report, he presents a low risk of future

18  substance abuse, and therefore the Court suspends the

19  mandatory condition for substance abuse testing as

20  defined under 18 U.S.C. 3583(d); however, this does

21  not preclude the U.S. Probation Office from

22  administering drug tests as they deem appropriate.

23           Mr. Donelson shall also comply with the

24  following special conditions:

25           He shall submit to a polygraph testing as

57

1    directed by the United States Probation Office as part

2    of his sex offender therapeutic program.  The costs of

3    this testing are to be paid by the defendant as

4    directed by the probation officer.

5         He shall participate in a program approved by

6    the United States Probation Office for mental health

7    treatment to include a psychosexual evaluation and sex

8    offender treatment.  The costs of these programs are

9    to be paid by the defendant as directed by the

10   probation officer.

11        Mr. Donelson shall waive all rights of

12   confidentiality regarding sex offender mental health

13   treatment to allow the release of information to the

14   United States Probation Office and authorize

15   communication between the probation officer and the

16   treatment provider.

17        He shall not engage in employment or

18   volunteer services that allow him access to computers

19   or minors.

20        He shall not purchase, possess, or view any

21   sexually explicit materials or images using young

22   juvenile models under the age of 18 in any format,

23   including but not limited to in magazines, books, on

24   the computer, or any electronic device, and videos,

25   movies, and television.

1          The defendant shall have no contact with

2     minors unless supervised by a competent informed adult

3     approved in advance by the probation officer.

4          He shall not utilize any sex-related adult

5     telephone services, websites, or electronic bulletin

6     boards.

7          Mr. Donelson shall submit any records

8     requested by the probation officer to verify

9     compliance with this condition including but not

10    limited to credit card bills, telephone bills, and

11    cable satellite television bills.

12         Pursuant to the Adam Walsh Child Protection

13    and Safety Act of 2006, Mr. Donelson shall register

14    with the state sex offender registration agency in any

15    state where he resides, works, or attends school

16    according to the federal and state law and as directed

17    by the probation officer.

18         Pursuant to the Adam Walsh Child Protection

19    and Safety Act of 2006, the defendant shall submit to

20    a search of his person, property, house, residence,

21    vehicle, papers, computer, other electronic

22    communication or data storage devices or media and

23    effects at any time by any law enforcement or

24    probation officer with reasonable suspicion concerning

25    unlawful conduct or a violation of the condition of

1   supervision upon prior notification to and approval by

2   the Court or with a warrant.

3          The Court has considered the defendant's net

4   worth and liquid assets, his lifestyle and financial

5   needs as reflected in the presentence report, his

6   earning potential, and the lack of dependents relying

7   on his support.  The Court -- although he has

8   dependents relying on his support.  The Court finds

9   that he is not capable of paying a fine and is not

10  capable of making payments toward the Justice for

11  Victims of Trafficking Act and the Amy, Vicky, and

12  Andy Child Pornography Victim Assistance Act.

13         Accordingly, he shall pay the following total

14  penalties:

15         As to Count One, he shall pay a special

16  assessment in the amount of $100.  He shall make

17  restitution in an amount that is to be determined.

18  The special assessment and the restitution shall be

19  due in full immediately.  Any balance remaining unpaid

20  on the special assessment and the restitution at the

21  inception of supervision shall be paid by the

22  defendant in installments of not less than $50 per

23  month until paid in full.  Said payment shall commence

24  60 days after his supervision begins.

25         Nothing in the Court's order shall prohibit

1  the collection of any judgment or fine by the United

2  States.  And any forfeiture previously entered is

3  hereby made a part of the sentence and shall be

4  included in the judgment.

5          All right.  Is there anything else I need to

6  cover?

7          MR. ELLIKER:  No, Your Honor.

8          MS. GRADY:  None other than the appellate

9  rights, Your Honor.

10          THE COURT:  Right.  I just wanted to make

11  sure I didn't miss anything on the judgment.

12          So, Mr. Donelson, you do have a right to

13  appeal the conviction and sentence.  If you were to do

14  so, you would have to file something in writing within

15  14 days.

16          And, sir, I do hope you feel better, and I

17  wish you well.  All right.  We can call court.

18          (The proceedings were adjourned at 1:13 p.m.)

19

20      I, Diane J. Daffron, certify that the foregoing is

21   a correct transcript from the record of proceedings

22   in the above-entitled matter.

23

24          /s/
    _____   _____
25          DIANE J. DAFFRON, RPR, CCR       DATE